**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | |
|---|---|
| JAMES BARB, Individually and for Others Similarly Situated<br><br>v.<br><br>HEATH CONSULTANTS, INC. | Case No. <u>1:23CV00058</u><br><br>Jury Trial Demanded<br><br>Rule 23 Class Action<br>FLSA Collective Action |

**ORIGINAL CLASS & COLLECTIVE ACTION COMPLAINT**

### SUMMARY

1.      James Barb ("Barb") brings this class and collective action to recover unpaid wages and other damages from Heath Consultants, Inc. ("Heath").

2.      Heath employs Barb as one of its Hourly Utility Locators (defined below) in Virginia and Tennessee.

3.      Barb and the other Hourly Utility Locators regularly work more than 40 hours in a workweek.

4.      But Heath does not pay Barb and its other Hourly Utility Locators for all the hours they work.

5.      Instead, Heath requires Barb and the other Hourly Utility Locators to work significant time "off the clock" without pay.

6.      Specifically, Heath prohibits Barb and the other Hourly Utility Locators from clocking in for their shifts until they arrive at their first assigned ticket; and Heath requires Barb and the other Hourly Utility Locators to clock out for their shifts when they leave their last assigned ticket (Heath's "ticket to ticket policy").

7.     But to meet Heath's strict productivity requirements, Barb and the other Hourly Utility Locators are forced to perform compensable work "off the clock" before arriving to their first assigned ticket and after leaving their last assigned ticket.

8.     Heath, however, does not pay Barb and the other Hourly Utility Locators for the time they spend performing this pre- and post-ticket work "off the clock."

9.     Heath's uniform "ticket to ticket" policy violates the Fair Labor Standards Act ("FLSA") and the Virginia Overtime Wage Act ("VOWA") by depriving Barb and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

10.    Likewise, Heath's uniform "ticket to ticket" policy violates the Virginia Wage Payment Act ("VWPA") by depriving Barb and the other Hourly Utility Locators of earned wages (at their agreed hourly rates) for all hours worked.

11.    Similarly, Heath also automatically deducts 30 minutes a day from Barb's and its other Hourly Utility Locators' recorded work time for so-called "meal breaks" (Heath's "auto-deduct policy").

12.    Heath therefore does not pay Barb and its other Hourly Utility Locators for that time.

13.    But Barb and the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

14.    Instead, to meet Heath's strict productivity requirements, Barb and the other Hourly Utility Locators are forced to perform their regular utility locating duties "off the clock" during their unpaid "meal breaks" for Heath's predominant benefit.

15.    Heath's uniform auto-deduct policy therefore violates the FLSA and VOWA by depriving Barb and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

16.     Likewise, Heath's uniform auto-deduct policy violates the VWPA by depriving Barb and the other Hourly Utility Locators of earned wages (at their agreed hourly rates) for all hours worked.

17.     Finally, in addition to failing to pay Barb and its other Hourly Utility Locators for all their hours worked, Heath also fails to pay these workers overtime wages at the proper premium rate.

18.     Specifically, Heath pays Barb and its other Hourly Utility Locators taxable fringe pay, which Heath intentionally excludes when calculating their regular rates of pay for overtime purposes (Heath's "fringe pay scheme").

19.     Heath's fringe pay scheme violates the FLSA and VOWA by depriving Barb and the other Hourly Utility Locators of overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for their hours worked over 40 in a workweek.

## JURISDICTION & VENUE

20.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA, 29 U.S.C. § 216(b).

21.     This Court also has supplemental jurisdiction over the state-law subclass claims because these claims arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

22.     This Court has specific personal jurisdiction over Heath based on Heath's substantial contacts with, and conduct directed towards, Virginia that form the basis of this action.

23.     Venue is proper because a substantial portion of the events or omissions giving rise to this action occurred in this District and Division. 28 U.S.C. § 1391(b)(2).

24.     Specifically, Heath primarily employs Barb in and around Washington and Smyth Counties, Virginia, which are in this District and Division

## PARTIES

25.    Barb has worked for Heath as a Utility Locator in and around Washington and Smyth Counties, Virginia, as well as Sullivan, Washington, and Carter Counties, Tennessee since approximately February 2020.

26.    Throughout his employment, Heath classified Barb as non-exempt and paid him on an hourly basis.

27.    Throughout his employment, Heath subjected Barb to its uniform, illegal "ticket to ticket" and auto-deduct policies.

28.    But throughout his employment, Heath required Barb to perform compensable work "off the clock" (without pay) before arriving to his first assigned ticket, after leaving his last assigned ticket, and during his "meal breaks" in willful violation of the FLSA, VOWA, and VWPA.

29.    Further, throughout his employment, Heath subjected Barb to its uniform, illegal fringe pay scheme, paying him taxable fringe pay that Heath intentionally excluded when calculating his regular rate of pay for overtime purposes in willful violation of the FLSA and VOWA.

30.    Barb's written consent is attached as **Exhibit 1**.

31.    Barb brings this class and collective action on behalf of himself and other similarly situated hourly, non-exempt Heath Utility Locators who are subject to Heath's "ticket to ticket" policy, auto-deduct policy, and/or fringe pay scheme.

32.    Heath prohibits each of these Utility Locators from clocking in until they arrive at their first assigned ticket and requires them to clock out when they leave their last assigned ticket.

33.    Likewise, Heath automatically deducts 30 minutes a day from each of these Hourly Utility Locators' recorded work time for so-called "meal breaks."

34.    But Heath also requires each of these Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

35.    Further, Heath also pays each of these Utility Locators taxable fringe pay, which Heath intentionally excludes when calculating their regular rates of pay for overtime purposes.

36.    Thus, Heath uniformly deprives its Hourly Utility Locators of overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for all hours worked after 40 in a workweek, including those worked "off the clock," in willful violation of the FLSA and VOWA.

37.    Likewise, Heath uniformly deprives its Hourly Utility Locators of earned wages (at their agreed hourly rates) for all hours worked, including those worked "off the clock," in willful violation of the VWPA.

38.    The FLSA Collective of similarly situated employees is defined as:

> **All individuals who worked for Heath as hourly Utility Locators who were subject to Heath's "ticket to ticket" policy, auto-deduct policy, and/or fringe pay scheme at any time during the past 3 years ("FLSA Collective Members").**

39.    Barb also seeks to represent a class under the VOWA and VWPA pursuant to FED. R. CIV. P. 23.

40.    The Virginia Class of similarly situated employees is defined as:

> **All individuals who worked for Heath as hourly Utility Locators in Virginia who were subject to Heath's "ticket to ticket" policy, auto-deduct policy, and/or fringe pay scheme at any time during the 3 years prior to the filing of this Complaint until final resolution of this action ("Virginia Class Members").**

41.    The FLSA Collective Members and Virginia Class Members are collectively referred to as the "Hourly Utility Locators."

42.    Heath is a Delaware corporation headquartered in Houston, Texas.

43.     Heath is registered to do business in the Commonwealth.

44.     Heath may be served through its registered agent: **Corporation Service Company, 100 Shockoe Slip, 2nd Floor, Richmond, Virginia 23219**.

## FLSA COVERAGE

45.     At all relevant times, Heath was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

46.     At all relevant times, Heath was an "enterprise" within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

47.     At all relevant times, Heath was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because Heath has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on good or materials—such as cellphones, computers, vehicles, tools, and personal protective equipment—that have been moved in or produced for commerce.

48.     At all relevant times, Heath has had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

49.     At all relevant times, Barb and the other Hourly Utility Locators were Heath's covered "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

50.     At all relevant times, Barb and the other Hourly Utility Locators were engaged in commerce or in the production of goods for commerce.

51.     Under its uniform "ticket to ticket" policy, Heath prohibits Barb and the other Hourly Utility Locators from clocking in for their shifts until they arrive at their first assigned ticket and requires them to clock out for their shifts when they leave their last assigned ticket.

52.     Similarly, under its uniform auto-deduct policy, Heath automatically deducts 30 minutes a day from Barb's and the other Hourly Utility Locators' recorded work time for so-called "meal breaks."

53.     But Heath requires Barb and the other Hourly Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

54.     As a result, Heath fails to pay Barb and its other Hourly Utility Locators wages (including overtime) for the compensable work they perform "off the clock" before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

55.     Heath's uniform "ticket to ticket" and auto-deduct policies therefore violate the FLSA by depriving Barb and the other Hourly Utility Locators of overtime wages for all hours worked after 40 in a workweek. 29 U.S.C. § 207(a) & (e).

56.     Further, under its uniform fringe pay scheme, Heath also pays Barb and its other Hourly Utility Locators taxable fringe pay, which Heath intentionally excludes when calculating their regular rates of pay for overtime purposes.

57.     As a result, Heath fails to pay Barb and its other Hourly Utility Locators overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for their hours worked over 40 in a workweek.

58.     Heath's uniform fringe pay scheme therefore violates the FLSA. 29 U.S.C. § 207(a) & (e).

## FACTS

59.     Heath bills itself as a "world leader in utility protection and damage prevention" with operations nationwide.[1]

---

[1] https://heathus.com/about/ (last visited December 21, 2023).

60.     To meet its business objectives, Heath hires Utility Locators (including Barb and the other Hourly Utility Locators) to provide underground utility locating services to its clients.

61.     Heath uniformly classifies Barb and its other Hourly Utility Locators as non-exempt and pays them on an hourly basis.

62.     Barb and the other Hourly Utility Locators regularly work more than 40 hours a workweek.

63.     But Heath does not pay Barb and its other Hourly Utility Locators for all their hours worked.

64.     Instead, Heath uniformly subjects Barb and its other Hourly Utility Locators to its illegal "ticket to ticket" and auto-deduct policies and forces them to perform compensable work "off the clock" (without pay) before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

65.     Further, Heath uniformly subjects Barb and its other Hourly Utility Locators to its illegal fringe pay scheme that deprives them of overtime wages at the proper premium rate.

66.     While exact job duties and precise locations may differ, Barb and the other Hourly Utility Locators are subject to Heath's same or similar illegal policies—Heath's "ticket to ticket" and/or auto-deduct policies—for similar work.

67.     For example, Barb has worked for Heath as a Utility Locator in and around Washington and Smyth Counties, Virginia, as well as Sullivan, Washington, and Carter Counties, Tennessee since approximately February 2020.

68.     Barb is Heath's hourly employee.

69.     Indeed, Heath agreed to pay Barb approximately $19/hour (plus overtime for his hours worked over 40 in a workweek).

70.     As a Utility Locator, Barb's primary responsibilities include locating network lines for gas, electrical, cable, and communications companies (Heath's clients) and identifying whether the utility owner's underground utilities conflict with proposed excavation locations.

71.     Throughout his employment, Heath required Barb to report his work time to Heath for approval through its uniform timekeeping and ticketing systems.

72.     Throughout his employment, Barb regularly worked more than 40 hours a workweek.

73.     Indeed, Barb typically worked 8 to 10 hours a day for 5 to 6 days a workweek (or 40 to 60 hours a workweek) "on the clock."

74.     For example, during the workweek ending on September 23, 2023, Barb worked 62.75 hours "on the clock":

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 19.0000 | 40.00 | 760.00 | 23,708.74 |
| Overtime | 28.5000 | 22.75 | 648.38 | 3,103.89 |
| Taxable Fringe | | | 21.00 | 819.00 |
| Float Hol | | | | 414.00 |
| Holiday | | | | 692.00 |
| Pto | | | | 1,605.00 |
| Retro Pay | | | | 949.89 |
| Service Award | | | | 25.00 |
| Gross Pay | | | $1,429.38 | 31,317.52 |

75.     But throughout his employment, Heath subjected Barb to its illegal "ticket to ticket" policy.

76.     Specifically, Heath prohibits Barb from clocking in for his shifts until he arrives at his first assigned ticket and requires him to clock out when he leaves his last assigned ticket.

77.     But Heath also requires Barb to perform compensable work "off the clock" (without pay) before arriving at his first assigned ticket and after leaving his last assigned ticket.

78.    Specifically, to meet Heath's strict productivity requirements, Barb is forced to review tickets, route plan, make/take calls from Heath's clients, perform mandatory vehicle inspections on his company-issued vehicle, drive to Heath's facility to pick up any necessary supplies, load his utility locating equipment into his company-issued vehicle, attend meetings, and/or drive to his first assigned ticket "off the clock" and without pay.

79.    Likewise, after clocking out upon completing his last assigned ticket, Barb is forced to drive to Heath's facility to pick up/drop off any necessary supplies, drive home, unload his utility locating equipment from his company-issued vehicle, perform mandatory vehicle inspections on his company-issued vehicle, review tickets, route plan, make/take calls from Heath's clients, attend meetings, and/or respond to any emergencies "off the clock" and without pay.

80.    This pre- and post-ticket "off the clock" work takes Barb approximately 1 to 3 hours a day (or 5 to 18 hours a workweek).

81.    But under Heath's illegal "ticket to ticket" policy, Heath does not pay Barb for his mandatory and necessary pre- and post-ticket "off the clock" work.

82.    Similarly, throughout his employment, Heath subjected Barb to its illegal auto-deduct policy.

83.    Specifically, Heath automatically deducts 30 minutes a day from Barb's recorded work time for so-called "meal breaks," regardless of whether he actually receives a *bona fide* meal break.

84.    But Barb does not actually receive *bona fide* meal breaks.

85.    Instead, to complete his heavy workload in accordance with Heath's strict productivity requirements, Barb is forced to perform his regular utility locating duties "off the clock" during his unpaid "meal breaks."

86.    So, rather than receiving overtime pay for all his hours worked over 40 in a workweek, under its illegal "ticket to ticket" and auto-deduct policies, Heath only pays Barb for the time he works

between his arrival at his first assigned ticket and his departure from his last assigned ticket, less his 30-minute on-duty "meal break," in willful violation of the FLSA and VOWA.

87.     Likewise, as a result of its illegal "ticket to ticket" and auto-deduct policies, Heath deprives Barb of earned wages (at his agreed hourly rate) for the compensable work he performs "off the clock" before he arrives at his first assigned ticket, after he leaves his last assigned ticket, and during his on-duty "meal breaks" in willful violation of the VWPA.

88.     Finally, throughout his employment, Heath subjected Barb to its uniform, illegal fringe pay scheme.

89.     Specifically, Heath pays Barb taxable fringe pay each workweek:

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 19.0000 | 40.00 | 760.00 | 23,708.74 |
| Overtime | 28.5000 | 22.75 | 648.38 | 3,103.89 |
| Taxable Fringe | | | 21.00 | 819.00 |
| Float Hol | | | | 414.00 |
| Holiday | | | | 692.00 |
| Pto | | | | 1,605.00 |
| Retro Pay | | | | 949.89 |
| Service Award | | | | 25.00 |
| Gross Pay | | | $1,429.38 | 31,317.52 |

90.     But Heath intentionally excludes Barb's taxable fringe pay when calculating his regular rate of pay for overtime purposes.

91.     Thus, under its illegal fringe pay scheme, Heath fails to pay Barb overtime wages at a rate not less than 1.5 times his regular rate of pay—based on *all* renumeration received—for the hours he works over 40 in a workweek in willful violation of the FLSA and VOWA.

92.     Heath subjects its other Hourly Utility Locators according to the same illegal policies it imposes on Barb.

93.     Like Barb, Heath pays its other Hourly Utility Locators on an hourly basis.

94.     Like Barb, Heath requires its other Hourly Utility Locators to report their hours worked to Heath for approval via Heath's uniform timekeeping and ticketing systems.

95.     Thus, Heath's records show that, like Barb, the other Hourly Utility Locators regularly work more than 40 hours a workweek.

96.     Indeed, like Barb, the other Hourly Utility Locators typically work 8 to 10 hours a day for 5 to 6 days a workweek (or 40 to 60 hours a workweek) "on the clock."

97.     Heath also uniformly subjects its other Hourly Utility Locators to the same policies, procedures, and strict operational and productivity requirements that it imposed on Barb.

98.     Heath uniformly requires Barb and the other Hourly Utility Locators to complete their work tickets in a timely manner per Heath's company-wide policy.

99.     Heath uniformly pressures and expects Barb and the other Hourly Utility Locators to complete as many tickets as possible.

100.    And Heath closely supervises and tracks Barb's and the other Hourly Utility Locators' productivity through its ticketing system to ensure they comply with Heath's uniform expectations and complete their heavy workloads.

101.    In fact, Heath installs GPS trackers and dash cams (known as "Mobile Eyes") on Barb's and the other Hourly Utility Locators' company-issued vehicles to monitor all their activities, movements, and locations to ensure they complete their heavy workloads in accordance with Heath's strict productivity and operational requirements.

102.    But, like Barb, Heath does not pay its other Hourly Utility Locators for all their hours worked.

103.    Instead, like Barb, the other Hourly Utility Locators are forced to perform compensable work "off the clock" (without pay) before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

104. Indeed, Heath subjects its other Hourly Utility Locators to its same illegal "ticket to ticket" policy that it imposes on Barb.

105. Specifically, Heath prohibits its Hourly Utility Locators (like Barb) from clocking in for their shifts until they arrive at their first assigned ticket and requires them to clock out for their shifts when they leave their last assigned ticket.

106. But like Barb, Heath also requires its other Hourly Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

107. The "off the clock" work Barb and the other Hourly Utility Locators perform before they arrive at their first assigned ticket and after they leave their last assigned ticket is similar if not the same.

108. Specifically, before clocking in for their shifts, the other Hourly Utility Locators (like Barb) are forced to review tickets, route plan, make/take calls from Heath's clients, perform mandatory vehicle inspections on their company-issued vehicles, drive to Heath's facility to pick up any necessary supplies, load their utility locating equipment into their company-issued vehicles, attend meetings, and/or drive to their first assigned ticket "off the clock" and without pay.

109. Likewise, after clocking out for their shifts at their last assigned ticket, the other Hourly Utility Locators (like Barb) are forced to drive to Heath's facility to pick up/drop off any necessary supplies, drive home, unload their utility locating equipment from their company-issued vehicles, perform mandatory vehicle inspections on their company-issued vehicles, review tickets, route plan, make/take calls from Heath's clients, attend meetings, and/or respond to any emergencies "off the clock" and without pay.

110.    And like Barb, the other Hourly Utility Locators spend approximately 1 to 3 hours a day (or 5 to 18 hours a workweek) performing this compensable pre- and post-ticket work "off the clock" without pay.

111.    Heath controls Barb's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work, and this "off the clock" work is undertaken primarily for the benefit of Heath's business of providing utility locating services to its clients.

112.    Further, this mandatory pre- and post-ticket "off the clock" work is necessary to the principal work Barb and the other Hourly Utility Locators perform as Heath Utility Locators.

113.    Indeed, Barb and the other Hourly Utility Locators cannot provide utility locating services to Heath's clients in accordance with Heath's strict productivity and operational requirements unless they perform this pre- and post-ticket "off the clock" work.

114.    In other words, Barb's and the other Hourly Utility Locators' mandatory pre- and post-ticket "off the clock" work is a fundamental requirement of their jobs as Heath Utility Locators.

115.    Indeed, Heath could not eliminate this pre- and post-ticket "off the clock" work altogether without impairing Barb's and the other Hourly Utility Locators' ability to perform their utility locating work for Heath.

116.    Rather, this mandatory pre- and post-ticket "off the clock" work is integral and indispensable to Barb's and the other Hourly Utility Locators' work as Heath Utility Locators.

117.    Thus, Barb and the other Hourly Utility Locators routinely perform this mandatory pre- and post-ticket "off the clock" work for Heath's—not their own—predominant benefit.

118.    And Heath knows Barb and its other Hourly Utility Locators perform this compensable pre- and post-ticket work "off the clock."

119.     Again, Heath closely monitors and tracks Barb and the other Hourly Utility Locators work time and locations via its company-wide ticketing system, GPS trackers, and/or dash cameras to ensure they meet Heath's strict productivity requirements.

120.     Specifically, using timecard details and GPS data tracked by Heath's uniform ticketing system, Heath can easily determine whether Barb and the other Hourly Utility Locators are working "off the clock" before and after their shifts.

121.     Thus, Heath management level employees know, or should know, if Barb and the other Hourly Utility Locators are clocked out and if their vehicles are moving (and, therefore, they are working).

122.     And Barb and the other Hourly Utility Locators repeatedly complain to Heath management about being forced to work "off the clock" to complete their heavy workloads in satisfaction of Heath's strict productivity and operational requirements.

123.     But Heath fails to exercise its duty as Barb's and the other Hourly Utility Locators' employer to ensure these employees are not performing work that Heath does not want performed "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

124.     Thus, Heath requested, suffered, permitted, or allowed Barb and its other Hourly Utility Locators to work "off the clock" before they arrived at their first assigned tickets and after they left their last assigned tickets.

125.     Despite accepting the benefits, Heath does not pay Barb and its other Hourly Utility Locators for the time they spend performing this compensable work "off the clock."

126.     Thus, under Heath's illegal "ticket to ticket" policy, Heath deprives Barb and the other Hourly Utility Locators of overtime pay for the time they spend performing compensable work "off

the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket during workweeks in which they work over 40 hours in willful violation of the FLSA and VOWA.

127.    Likewise, under its illegal "ticket to ticket" policy, Heath deprives Barb and the other Hourly Utility Locators of earned wages (at their agreed hourly rates) for the time they spend performing compensable work "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket in willful violation of the VWPA.

128.    Similarly, Heath also subjects it other Hourly Utility Locators to the same illegal auto-deduct policy it imposes on Barb.

129.    Specifically, like Barb, Heath automatically deducts 30 minutes a day from its other Hourly Utility Locators' recorded work time for so-called "meal breaks."

130.    Heath automatically deducts this time regardless of whether its Hourly Utility Locators actually receive *bona fide* meal breaks.

131.    Heath simply assumes Barb and its other Hourly Utility Locators receive *bona fide* meal breaks.

132.    But, like Barb, the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

133.    Instead, to complete their assigned heavy workloads in accordance with Heath's uniform, strict operational and productivity requirements (and Heath's close monitoring of the same), Barb and the other Hourly Utility Locators are forced to perform their regular utility locating duties and responsibilities "off the clock" during their unpaid "meal breaks."

134.    The "off the clock" work Barb and the other Hourly Utility Locators perform during their "meal breaks" is similar if not the same.

135.    Specifically, during their unpaid "meal breaks," Barb and other Hourly Utility Locators regularly perform work-related tasks, such as completing tickets, driving from one ticket to another,

16

taking/making calls to Heath's clients, and/or route planning.

136.   Because of these constant work-related tasks, Barb and the other Hourly Utility Locators are not free to engage in personal activities during their unpaid "meal breaks."

137.   Thus, Barb and the other Hourly Utility Locators routinely spend their unpaid "meal breaks" performing work "off the clock" for Heath's—not their own—predominant benefit.

138.   This unpaid "off the clock" work is compensable under the FLSA and VOWA because Heath knew, or should have known, that: (1) Barb and the other Hourly Utility Locators were performing unpaid work during their "off the clock" meal breaks; (2) they were interrupted or subject to interruptions with work duties during any attempted meal break; (3) they were not completely relieved of all duties during their meal breaks; (4) they entirely skipped their meal breaks due to work demands; (5) their meal breaks were less than 30 consecutive minutes; (6) they were not free to engage in personal activities during their meal break because of constant interruptions; and/or (7) they spent their unpaid meal breaks performing their regular utility locating duties for Heath's predominant benefit.

139.   This unpaid "off the clock" work is also compensable under the VWPA because Heath agreed to pay Barb and the other Hourly Utility Locators set hourly rates of pay for all the hours of work they perform, and Heath fails to pay them for their hours worked "off the clock" during their on-duty "meal breaks."

140.   Heath fails to exercise its duty as Barb's and the other Hourly Utility Locators' employer to ensure they are not performing work that Heath does not want performed "off the clock" during their unpaid "meal breaks."

141.   And Heath knows Barb and the other Hourly Utility Locators regularly work "off the clock" during their unpaid "meal breaks."

142.   Specifically, using timecard details and GPS data tracked by Heath's uniform ticketing

system, Heath can easily determine whether Barb and the other Hourly Utility Locators are working "off the clock" during their unpaid "meal breaks."

143.    Despite accepting the benefits, Heath does not pay Barb and its other Hourly Utility Locators for the compensable work they perform "off the clock" during their unpaid "meal breaks."

144.    Thus, under Heath's illegal auto-deduct policy, Heath deprives Barb and the other Hourly Utility Locators of overtime pay for their on-duty "meal breaks" during workweeks in which they work over 40 hours in willful violation of the FLSA and VOWA.

145.    Likewise, under Heath's illegal auto-deduct policy, Heath deprives Barb and the other Hourly Utility Locators of earned wages (at their agreed hourly rates) for their on-duty meal breaks in willful violation of the VWPA.

146.    Finally, Heath also subjects its other Hourly Utility Locators to the same illegal fringe pay scheme it imposes on Barb.

147.    Specifically, like Barb, Heath pays its other Hourly Utility Locators taxable fringe pay each week.

148.    But, just as with Barb, Heath intentionally excludes the Hourly Utility Locators' taxable fringe pay when calculating their regular rates of pay for overtime purposes.

149.    Thus, under Heath's illegal fringe pay scheme, Heath deprives Barb and the other Hourly Utility Locators of overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for their hours worked over 40 in a workweek in willful violation of the FLSA and VOWA.

## CLASS & COLLECTIVE ACTION ALLEGATIONS

150.    Barb incorporates all other paragraphs by reference.

151.    Like Barb, the other Hourly Utility Locators were victimized by Heath's illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme.

152.     Other Hourly Utility Locators worked with Barb and indicated they were paid in the same manner, performed similar work, and were subject to Heath's same illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme.

153.     Based on his experience with Heath, Barb is aware Heath's illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme were imposed on the other Hourly Utility Locators.

154.     The Hourly Utility Locators are similarly situated in the most relevant respects.

155.     Even if their specific job titles or precise locations might vary, these differences do not matter for the purpose of determining their entitlement to earned wages for all hours worked and overtime pay at the proper premium rate for all hours worked over 40 in a workweek.

156.     Therefore, the specific job titles or precise job locations of the various Hourly Utility Locators do not prevent class or collective treatment.

157.     Rather, the Hourly Utility Locators are held together by Heath's uniform, illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme, which systematically deprived Barb and the other Hourly Utility Locators of earned wages for all hours worked and overtime wages at the proper premium rate for all hours worked after 40 in a workweek.

158.     Heath's failure to pay earned wages and overtime wages as required by the FLSA and Virginia wage laws results from generally applicable, systematic policies and practices which are not dependent on the personal circumstances of the Hourly Utility Locators.

159.     Heath's records reflect the number of hours the Hourly Utility Locators recorded they worked each workweek.

160.     Heath's records also show the number of hours the Hourly Utility Locators *actually* worked each workweek.

161.     And Heath's records further show it automatically deducted 30 minutes a day from the Hourly Utility Locators' recorded work time for so-called "meal breaks."

162.     Further, Heath records show it paid its Hourly Utility Locators taxable fringe pay that Heath excluded when calculating their regular rates of pay for overtime purposes.

163.     The back wages owed to Barb and the other Hourly Utility Locators can therefore be calculated using the same formula applied to the same records.

164.     Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Heath's records, and there is no detraction from the common nucleus of liability facts.

165.     Therefore, the issue of damages does not preclude class or collective treatment.

166.     Barb's experiences are therefore typical of the experiences of the other Hourly Utility Locators.

167.     Barb has no interest contrary to, or in conflict with, the other Hourly Utility Locators that would preclude class or collective treatment.

168.     Like each Hourly Utility Locator, Barb has an interest in obtaining the unpaid wages owed to them under federal and Virginia law.

169.     Barb and his counsel will fairly and adequately protect the interests of the other Hourly Utility Locators.

170.     Barb retained counsel with significant experience in handling complex class and collective action litigations.

171.     A class and collective action is superior to other available means for fair and efficient adjudication of this lawsuit.

172.     Absent this class and collective action, many Hourly Utility Locators likely will not obtain redress for their injuries, and Heath will reap the unjust benefits of violating the FLSA and Virginia wage laws.

173.     Further, even if some of the Hourly Utility Locators could afford individual litigation against Heath, it would be unduly burdensome to the judicial system.

174.     Indeed, the multiplicity of actions would create a hardship to the Hourly Utility Locators, the Court, and Heath.

175.     Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Utility Locators' claims.

176.     The questions of law and fact that are common to each Hourly Utility Locator predominate over any questions affecting solely the individual members.

177.     Among the common questions of law and fact are:

a.     Whether Heath engaged in a policy and practice of prohibiting its Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket;

b.     Whether Heath engaged in a policy and practice of requiring its Hourly Utility Locators to clock out for their shifts once they left their last assigned ticket;

c.     Whether Heath engaged in a policy and practice of deducting 30 minutes a day from the Hourly Utility Locators' recorded work time for "meal breaks," regardless of whether they actually received a *bona fide*, uninterrupted meal break;

d.     Whether Heath knew, or had reason to know, it requested, suffered, permitted, or allowed the Hourly Utility Locators to work "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their unpaid "meal breaks";

e.      Whether Heath failed to pay its Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," in violation of the FLSA and VOWA;

f.      Whether Heath failed to pay its Hourly Utility Locators earned wages (at their agreed hourly rates) for all hours worked, including those worked "off the clock," in violation of the VWPA;

g.      Whether Heath paid its Hourly Utility Locators taxable fringe pay that Heath excluded when calculating their regular rates of pay for overtime purposes;

h.      Whether Heath failed to pay its Hourly Utility Locators overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for their hours worked over 40 in a workweek in violation of the FLSA and VOWA;

i.      Whether Heath's decision not to pay the Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," was made in good faith;

j.      Whether Heath's decision to not pay the Hourly Utility Locators all their earned wages (at their agreed hourly rates) for all hours worked, including those worked "off the clock," was made in good faith;

k.      Whether Heath's decision to exclude the Hourly Utility Locators' fringe pay when calculating their regular rates of pay for overtime purposes was made in good faith; and

l.      Whether Heath's violations were willful.

178.    Barb knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

179.    As part of its regular business practices, Heath intentionally, willfully, and repeatedly violated the FLSA, VOWA, and VWPA with respect to Barb and the other Hourly Utility Locators.

180.    Heath's illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme deprived Barb and the other Hourly Utility Locators of earned wages for all hours worked and overtime wages at the proper premium rate for all hours worked after 40 in a workweek, which they are owed under federal and Virginia law.

181.    There are many similarly situated Hourly Utility Locators who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

182.    The Hourly Utility Locators are known to Heath and can be readily identified through Heath's business and personnel records.

### HEATH'S VIOLATIONS WERE WILLFUL AND/OR DONE IN RECKLESS DISREGARD OF THE FLSA AND VIRGINIA WAGE LAWS

183.    Barb incorporates all other paragraphs by reference.

184.    Heath knew it was subject to the FLSA's and VOWA's respective overtime provisions.

185.    Heath knew the FLSA and VOWA required it to pay non-exempt employees, including Barb and the other Hourly Utility Locators, overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for all hours worked after 40 in a workweek.

186.    Heath also knew it was subject to the VWPA.

187.    Heath knew the VWPA required it to pay employees, including Barb and the other Hourly Utility Locators, all wages earned (at the rates Heath agreed to pay them) for all hours of work performed.

188.    Heath knew Barb and the other Hourly Utility Locators were non-exempt employees entitled to overtime pay.

189.    Heath knew it paid Barb and the other Hourly Utility Locators on an hourly basis.

190.    Heath knew it also paid Barb and the other Hourly Utility Locators taxable fringe pay.

191.    Heath knew it included Barb's the other Hourly Utility Locators' fringe pay in their total taxable amount earned on each paystub.

192.    Heath knew it represented to Barb and its other Hourly Utility Locators that their fringe pay constituted part of their wages.

193.    Heath knew it represented to the IRS that Barb's and the other Hourly Utility Locators' fringe pay were wages.

194.    In other words, Heath knowingly classified Barb's and the other Hourly Utility Locators' fringe pay as wages.

195.    And Heath knew that all of Barb's and the other Hourly Utility Locators' wages (including their fringe pay) were considered renumeration for overtime purposes under the FLSA and VOWA.

196.    Nonetheless, Heath intentionally excluded Barb's and the other Hourly Utility Locators' fringe pay when calculating their regular rates of pay for overtime purposes in violation of the FLSA and VOWA.

197.    Heath's decision to exclude Barb's and the other Hourly Utility Locators' fringe pay when calculating their regular rates of pay for overtime purposes was neither reasonable, nor was it made in good faith.

198.    Heath knew Barb and each Hourly Utility Locators worked over 40 hours in at least one workweek during relevant period because Heath required them to record their hours worked using its timeclock and ticketing systems.

199.     Heath knew the FLSA, VOWA, and VWPA required it to pay employees, including Barb and the other Hourly Utility Locators, for all hours they performed compensable work.

200.     Heath knew that, as Barb's and the other Hourly Utility Locators' employer, it had a duty to ensure they were not performing work "off the clock" (without pay) that Heath did not want performed.

201.     Heath knew it prohibited Barb and the other Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket.

202.     Nonetheless, Heath knew Barb and the other Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket.

203.     Likewise, Heath knew it required Barb and the other Hourly Utility Locators to clock out for their shifts when they left their last assigned ticket.

204.     Nonetheless, Heath knew Barb and the other Hourly Utility Locators performed compensable work "off the clock" after they left their last assigned ticket.

205.     Heath knew it controlled Barb's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work.

206.     Heath knew Barb's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was undertaken for Heath's predominant benefit.

207.     Heath knew Barb's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was necessary to the principal work they performed as Heath Utility Locators.

208.     Heath knew Barb's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was integral and indispensable to their work as Heath Utility Locators.

209.     Heath also knew it failed to provide Barb and the other Hourly Utility Locators with *bona fide*, uninterrupted meal breaks.

210.   Heath knew Barb and the other Hourly Utility Locators did not actually receive *bona fide*, uninterrupted meal breaks.

211.   Heath knew Barb and the other Hourly Utility Locators regularly worked during their unpaid meal breaks.

212.   Heath knew Barb and the other Hourly Utility Locators regularly spent their unpaid meal breaks on-duty and performing their regular utility locating job duties for Heath's predominant benefit.

213.   Nonetheless, Heath automatically deducted 30 minutes a day from Barb's and the other Hourly Utility Locators' recorded work time for so-called "meal breaks."

214.   Thus, Heath knew it requested, suffered, permitted, or allowed Barb and the other Hourly Utility Locators to work "off the clock" (without pay) before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks."

215.   Indeed, Heath knew Barb and other Hourly Utility Locators complained to Heath's management, HR, and/or their supervisors about being forced to work "off the clock" (without pay) before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks."

216.   In other words, Heath knew, should have known, or recklessly disregarded whether Barb and the other the Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks."

217.   Nonetheless, Heath did not pay Barb and the other Hourly Utility Locators for the work they performed "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks."

218.     Thus, Heath knew, should have known, or recklessly disregarded whether it failed to pay Barb and the other Hourly Utility Locators for all the hours they performed compensable work.

219.     Heath's decision to prohibit Barb and the other Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket was neither reasonable, nor was it made in good faith.

220.     Heath's decision to require Barb and the other Hourly Utility Locators to clock out for their shifts when they left their last assigned ticket was neither reasonable, nor was it made in good faith.

221.     Heath's decision to deduct 30 minutes a day from Barb's and the other Hourly Utility Locators' recorded work time for "meal breaks" regardless of whether they actually received *bona fide* meal breaks was neither reasonable, nor was it made in good faith.

222.     Heath's failure to pay Barb and the other Hourly Utility Locators overtime wages for all overtime hours worked was neither reasonable, nor was its decision not to pay these employees overtime wages for all overtime hours worked made in good faith.

223.     Likewise, Heath's failure to pay Barb and the other Hourly Utility Locators overtime at the proper premium rate was neither reasonable, nor was its decision not to pay these employees overtime wages at the proper premium rate made in good faith.

224.     And Heath's failure to pay Barb and the other Hourly Utility Locators all their earned wages (at their agreed hourly rates) for all hours worked was neither reasonable, nor was its decision not to pay these employees all their earned wages (at their agreed hourly rates) for all hours worked made in good faith.

225.     Heath knowingly, willfully, and/or in reckless disregard carried out its illegal "ticket to ticket" policy, auto-deduct policy, and fringe pay scheme that deprived Barb and the other Hourly

Utility Locators of earned wages for all hours worked and overtime wages at the proper premium rate for all hours worked after 40 in a workweek in violation of the FLSA, VOWA, and VWPA.

226.    Heath knew, should have known, or recklessly disregarded whether its conduct described in this Complaint violated the FLSA, VOWA, and VWPA.

227.    Indeed, Heath has been repeatedly sued by employees for failing to pay proper wages, including for the same illegal policies that form the basis of this action. *See, e.g., Jankuski, et al. v. Heath Consultants, Inc.*, No. 1:12-CV-04549 (N.D. Ill.); *Pierce, et al. v. Heath Consultants, Inc.*, No. 2:10-CV-00585 (W.D. Wash.).

COUNT I

FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA
(FLSA COLLECTIVE)

228.    Barb incorporates all other paragraphs by reference.

229.    Barb brings his FLSA claims on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

230.    Heath violated, and is violating, the FLSA by employing non-exempt employees (Barb and the other FLSA Collective Members) in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for all hours worked after 40 in a workweek, including hours worked "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and during their "meal breaks."

231.    Heath's unlawful conduct harmed Barb and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

232.    Accordingly, Heath owes Barb and the other FLSA Collective Members the difference between the overtime wages actually paid and the proper overtime wages actually earned.

233.     Because Heath knew, or showed reckless disregard for whether, its policies violated the FLSA, Heath owes these wages for at least the past 3 years.

234.     Heath is also liable to Barb and the other FLSA Collective Members for an additional amount equal to all unpaid wages as liquidated damages.

235.     Finally, Barb and the other FLSA Collective Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

**COUNT II**

**FAILURE TO PAY OVERTIME WAGES UNDER THE VOWA
(VIRGINIA CLASS)**

236.     Barb incorporates all other paragraphs by reference.

237.     Barb brings his VOWA overtime claim on behalf of himself and the other Virginia Class Members pursuant to FED. R. CIV. P. 23.

238.     Heath's conduct violates the VOWA (VA. CODE § 40.1-29.2).

239.     At all relevant times, Heath was subject to the VOWA because Heath was (and is) an "employer" within the meaning of the VOWA.

240.     At all relevant times, Heath employed Barb and the other Virginia Class Members as its covered "employees" within the meaning of the VOWA.

241.     Barb and the other Virginia Class Members are non-exempt employees entitled to overtime wages under the VOWA.

242.     The VOWA requires employers, like Heath, to pay non-exempt employees, including Barb and the other Virginia Class Members, overtime wages at rates not less than 1.5 times their regular rates of pay—based on *all* renumeration received—for all hours worked after 40 in a workweek. VA. CODE § 40.1-29.2.

243.     Heath violated, and is violating, the VOWA by failing to pay Barb and the other Virginia Class Members overtime wages at rates not less than 1.5 times their regular rates of pay—

based on *all* renumeration received—for all hours worked after 40 in a workweek, including hours worked "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and during their "meal breaks."

244.    Heath's unlawful conduct harmed Barb and the other Virginia Class Members by depriving them of the overtime wages they are owed.

245.    Accordingly, Heath owes Barb and the other Virginia Class Members the difference between the overtime wages actually paid and the proper overtime wages actually earned from July 1, 2021 until final resolution of this action, plus an additional amount as liquidated damages. VA. CODE §§ 40.1-29(J) and 40.1-29.2.

246.    Because Heath "knowingly" failed to pay Barb and the other Virginia Class Members the proper premium overtime wages for all their overtime hours worked, Heath owes these employees treble damages in an amount equal to three times their unpaid wages. VA. CODE § 40.1-29(J).

247.    Finally, Barb and the other Virginia Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action. VA. CODE § 40.1-29(J).

### COUNT III

### FAILURE TO PAY ALL WAGES EARNED UNDER THE VWPA
### (VIRGINIA CLASS)

248.    Barb incorporates all other paragraphs by reference.

249.    Barb brings his VWPA claim on behalf of himself and the other Virginia Class Members pursuant to FED. R. CIV. P. 23.

250.    Heath's conduct violates the VWPA (VA. CODE § 40.1-29).

251.    At all relevant times, Heath was subject to the VWPA because Heath was (and is) an "employer" within the meaning of the VWPA.

252.    At all relevant times, Heath employed Barb and the other Virginia Class Members as its covered "employees" within the meaning of the VWPA.

253.     The VWPA requires employers, like Heath, to pay employees, including Barb and the other Virginia Class Members, for all the hours of work they perform at the rate(s) agreed to by the parties on their regular, established paydays. VA. CODE § 40.1-29.

254.     During the course of their employment, Heath agreed to pay Barb and each Virginia Class Member an hourly rate for all the hours of work they performed.

255.     Barb and each Virginia Class Member accepted Heath's offer.

256.     But during the course of their employment, Heath failed to pay Barb and the other Virginia Class Members for all the time they worked at the rates Heath agreed to pay them because Heath failed to include the time they worked "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and during their "meal breaks."

257.     Thus, Heath violated, and is violating, the VWPA by failing to pay Barb and the other Virginia Class Members all their earned wages (at the rates Heath agreed to pay them) for all the hours of work they performed for Heath's benefit.

258.     Heath's unlawful conduct harmed Barb and the other Virginia Class Members by depriving them of the earned wages they are owed.

259.     Accordingly, Heath owes Barb and the other Virginia Class Members their unpaid earned wages (at their agreed hourly rates) from the 3 years prior to the filing of this Complaint until final resolution of this action, plus an equal amount as liquidated damages. VA. CODE § 40.1-29(J).

260.     Because Heath "knowingly" failed to pay Barb and the other Virginia Class Members their earned wages, Heath owes these employees treble damages in an amount equal to three times their unpaid wages for the period July 1, 2021-June 30, 2022, during which the in-effect iteration of VOWA allowed for recovery of same. VA. CODE § 40.1-29(J).

261.     Finally, Barb and the other Virginia Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action. VA. CODE § 40.1-29(J).

**JURY DEMAND**

262.    Barb demands a trial by jury on all Counts.

**RELIEF SOUGHT**

WHEREFORE, Barb, individually and on behalf of the other Hourly Utility Locators, seeks the following relief:

a.    An Order designating this lawsuit as a collective action and authorizing notice to the FLSA Collective Members allowing them to join this action by filing a written notice of consent;

b.    An Order certifying a class action pursuant to FED. R. CIV. P. 23;

c.    An Order appointing Barb and his counsel to represent the interests of the Hourly Utility Locators;

d.    An Order finding Heath liable to Barb and the other FLSA Collective Members for all unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

e.    An Order finding Heath liable to Barb and the other Virginia Class Members for all their unpaid overtime wages owed under the VOWA, plus liquidated damages, and treble damages;

f.    An Order finding Heath liable to Barb and the other Virginia Class Members for all their unpaid earned wages owed under the VWPA, plus liquidated damages, and treble damages;

g.    Judgment awarding Barb and the other Hourly Utility Locators all unpaid earned wages, unpaid overtime wages, liquidated damages, treble damages, statutory damages, and any other penalties available under the FLSA, VOWA, and VWPA;

h.      An Order awarding attorneys' fees, costs, and expenses;

i.      Pre- and post-judgment interest at the highest applicable rates; and

j.      Such other and further relief as may be necessary and appropriate.

Dated: December 22, 2023.                    Respectfully submitted,

                                             **BUTLER CURWOOD, PLC**

                                      By: */s/ Zev H. Antell*
                                             Harris D. Butler, III (VSB No. 26483)
                                             Craig J. Curwood (VSB No.
                                             43975)
                                             Zev H. Antell (VSB No. 74634)
                                             Samantha R. Galina (VSB No. 96981)
                                             140 Virginia Street, Suite 302
                                             Richmond, VA 23219
                                             Phone: (804) 648-4848
                                             Fax:    (804) 237-0413
                                             Email: harris@butlercurwood.com
                                                     craig@butlercurwood.com
                                                     zev@butlercurwood.com
                                                     samantha@butlercurwood.com

                                             Michael A. Josephson, Esq.*
                                             Andrew W. Dunlap, Esq.*
                                             **JOSEPHSON DUNLAP, LLP**
                                             11 Greenway Plaza, Suite 3050
                                             Houston, TX 77046
                                             Phone: (713) 352-1100
                                             Fax:    (713) 352-3300
                                             Email: mjosephson@mybackwages.com
                                                     adunlap@mybackwages.com

                                             Richard J. (Rex) Burch, Esq.*
                                             **BRUCKNER BURCH, PLLC**
                                             11 Greenway Plaza, Suite 3025
                                             Houston, TX 77046
                                             Phone: (713) 877-8788
                                             Fax:    (713) 877-8065
                                             Email: rburch@brucknerburch.com

                                             *Pro hac vice applications forthcoming*

                                             **ATTORNEYS FOR BARB & THE
                                             HOURLY UTILITY LOCATORS**